UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES HERNDON,

               Plaintiff,

v.                                           Case No. 3:20-cv-616-BJD-MCR

CORIZON HEALTH, INC.,

               Defendant.

_____

## ORDER

### I.    Status

Plaintiff James Herndon, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1; Complaint) against Julie L. Jones; Mark S. Inch; Centurion of Florida, LLC; and Corizon Health, Inc. The only remaining Defendant is Corizon Health, Inc.[1]

Before the Court is Defendant Corizon Health, Inc.'s Motion for Summary Judgment (Doc. 83; Motion) with exhibits (Doc. 82). Plaintiff filed an Amended Response in Opposition (Doc. 95; Response) with an exhibit (Doc. 95-1), and Corizon filed a Reply (Doc. 96; Reply). The Motion is ripe for review.

---

[1] The claims against Defendants Jones, Inch, and Centurion were dismissed. See Orders (Docs. 75, 87). The Court also previously dismissed Plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act against Corizon. See Order (Doc. 48).

## II.     Plaintiff's Allegations

At the time Plaintiff filed the Complaint, he was 62 years old and had been diagnosed with Hepatitis C. <u>See</u> Complaint at 5. According to Plaintiff, in late 2013, the Food and Drug Administration approved direct acting antivirals (DAAs) that have the ability to cure Hepatitis C. <u>See</u> <u>id.</u> at 6. "By mid-2016[,] the [FDOC] revised its policies to acknowledge that prescribing DAA[]s to treat chronic [Hepatitis C] infection was the standard of care." <u>Id.</u> at 7; <u>see</u> <u>id.</u> at 9. Nevertheless, "Defendants knowingly [and] intentionally delayed these lifesaving medications to Plaintiff simply because it cost to[o] much. This policy, custom, and practice contravenes the prevailing standard of care and clearly reflects deliberate indifference to the Plaintiff's serious medical needs." <u>Id.</u> at 7.

Plaintiff asserts that his "medical file is replete with evidence" showing the escalation of his Hepatitis C and "undeniable liver damage," but Defendants' policy, custom, and practice "of ignoring and concealing the Plaintiff[']s medical condition from the Plaintiff in order to cover up the need for treatment with DAA[]s caused damage to the Plaintiff's liver that cannot be fixed." <u>Id.</u> at 9; <u>see also</u> <u>id.</u> at 8 ("Plaintiff has reached an advanced state of cirrhosis."). He contends that despite his requests for treatment, Defendants failed to inform him of the availability of DAAs "until after they were ordered to provide the necessary treatment" based on the <u>Hoffer</u> litigation. <u>Id.</u> at 10.

He asserts that the delay in treatment caused irreversible damage to his liver, and he now has a greater risk of developing liver cancer. Id. He further claims that due to the Defendants' policy, custom, and practice of not treating his Hepatitis C with DAAs based on cost, he "cannot participate in major life activities such as sports, long distance walking, running or social programs because he is in to[o] much pain." Id. at 10-11. He also asserts that he cannot participate in "programs such as yard activities, church services and walking like he use[d] to." Id. at 11.

Plaintiff claims that Corizon violated the Eighth Amendment, and he seeks declaratory relief, as well as compensatory and punitive damages. See id. at 11-14.

### III.   Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson

City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). However, "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)

4

(citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV.    Parties' Positions

Corizon argues that Plaintiff's Complaint is untimely filed and the record evidence fails to support his Eighth Amendment claim. <u>See generally</u> Motion. As to the first argument, Corizon contends that Plaintiff "was actually aware of the facts supporting his claim when he wrote" a particular grievance on March 8, 2014. <u>Id.</u> at 9. Because Plaintiff did not file this case until June 2020, Corizon claims it was filed more than two years too late. <u>Id.</u> at 9-10. Corizon further contends that the continuing violation doctrine does not apply, and even if it did, Plaintiff cannot meet the requirements of the doctrine. <u>Id.</u> at 10-12. Moreover, Corizon asserts that Plaintiff "plainly lied to the Court," which resulted in the Court denying Corizon's motion to dismiss and prolonged this litigation. <u>See id.</u> at 12-14.

As to Corizon's second argument, Corizon explains that "[m]edical providers are allowed to consider costs in providing care." <u>Id.</u> at 20. Corizon asserts that when it was providing contracted medical care to Florida inmates, the funding to provide treatment to inmates with HCV "just did not exist," and

"[i]ts mission and duty was to stage patients for treatment according to the severity of disease, so treatment could begin when funding was available." <u>Id.</u> at 21; <u>see also</u> <u>id.</u> at 22 ("Corizon did what was required by the [Federal Bureau of Prisons] guidelines: it prioritized and staged patients for treatment when funding became available."). Corizon argues it "did not have a policy of denying treatment based on cost; it had a policy of trying to get the funding," but its policy was "thwarted by the [FDOC], which despite promises to the contrary, never sought funding from the Florida Legislature." <u>Id.</u> at 23. According to Corizon, "[e]ven though [Plaintiff] was not provided with a DAA during Corizon's time, he was provided constitutionally adequate care, as he was routinely examined, tested and monitored." <u>Id.</u>

Corizon relies on the Declaration of Gregory Ladele, M.D., Corizon's National Medical Director, who avers, in pertinent part, as follows:

> In the United States, the Federal Bureau of Prisons (FBOP) Clinical Practice Guidelines for hepatitis C define the optimal management of hepatitis C virus infection in prisoners. Olysio and Sovaldi were FDA approved in late 2013, Harvoni and Viekira Pak in late 2014, and Daklinza in mid-2015. The first FBOP HCV Guideline to advocate use of these agents in patients without advanced liver fibrosis or other high-priority conditions was issued in July 2015.
>
> The availability of the Sovaldi-class of medications was a singular event. When combined with other [DAAs] in Harvoni, Viekira Pak and subsequently other combination products, these

medications promised a high rate of cure for Hepatitis C without the side effects of previous medication regimens, which included Interferon, a medication with debilitating side-effects. However, they came with a price: Sovaldi cost $84,000 when it was introduced; Harvoni was nearly $95,000 when released in late-2014. No company, including Corizon, could absorb those costs. The funding had to come from the Florida Legislature.

On more than one occasion, Corizon leadership asked the [FDOC] to obtain funding for Harvoni and similar [DAAs]. It was believed, not just by Corizon, but also Dr. Ogunsanwo, the [FDOC]'s Assistant Secretary for Health Services, that funding was requested and expected. Corizon also attempted to obtain the medications without cost from the manufacturer in return for providing data. Those attempts were unsuccessful.

In preparation for that funding and as national treatment guidelines were being developed, Corizon and the [FDOC] accumulated data for all inmates with Hepatitis C. This was done to stage and thereby prioritize patients for treatment. It was a daunting task, as Corizon and the [FDOC] needed to accumulate data on thousands of patients where there was no system in place for the task. As patients were seen during HCV clinic visits, laboratory values were reported and centrally collected to determine which patients should be initially treated. The mere collection of information took more than a year.

In the meantime, the guidelines were constantly evolving. For instance, in June 2014, the [FBOP] Interim Guidance for the Management of Chronic Hepatitis C Infection Purpose and Overview stated in pertinent part, "The preferred treatment regimen has changed with each of the new recently approved [DAAs]—resulting in rapidly changing clinical guidelines and treatment recommendations. While an

all-oral, interferon-free regimen is currently available for certain genotypes, even newer medications are expected to become available that will be safer, simpler, and more effective. In the midst of this rapidly changing treatment landscape, the most recently published guidance on HCV treatment (*www.hcvguidelines.org*) indicates that it is reasonable to postpone treatment for cases with less advanced fibrosis, pending the expected availability of better treatments in the very near future. *The purpose of this document is to provide interim guidance for the treatment of chronic HCV infection in the federal inmate population.* During this time of transition, the [F]BOP has established treatment priorities for inmates who have a more urgent need for intervention . . . ."

In July 2015, the next version of the FBOP Guideline reiterated the recommended prioritization of those with the most urgent need. "The AASLD/IDSA/IAS-USA guidelines also indicate that it is reasonable during this time of transition to prioritize for treatment those HCV cases with the most urgent need."

By the Fall of 2015, when it became clear that additional funding, including funding for hepatitis C treatment, was not coming, Corizon provided notice of cancellation of its contract to the [FDOC]. Corizon ceased providing services to Florida inmates in May 2016.

Several of Corizon's state government client partners were more successful in obtaining legislative funding for hepatitis C treatment. I'm most familiar with Michigan. Michigan DOC had a large-volume pegylated interferon plus ribavirin program that in 2013 added small-scale use of hybrid therapy with early [DAAs], transitioned in 2015 to small-moderate scale all-DAA therapy, and finally to large-scale all DAA therapy in early 2016. Successfully educating key

8

state administration and legislative leaders required a sustained and arduous effort. Other past and present Corizon client states that have high-volume treatment programs are Arizona, Kansas and Missouri.

I also reviewed [Plaintiff's] medical records. He was seen and evaluated on a regular basis. It is notable that ultrasound studies from 2001 through 2018, including after he completed treatment in June 2018, revealed only a mildly enlarged spleen and a cyst on the liver, which resolved. These studies show none of the usual signs of cirrhosis, such as nodules, fibrosis, varices, ascites and markedly increased portal vein hypertension. His condition did not worsen to any significant degree over time.

Doc. 82-1 at 1-5 (paragraph enumeration omitted).

Corizon also submitted a copy of its letter to the FDOC Secretary advising that it was terminating its contract effective May 31, 2016, see Doc. 82-3, and some of Plaintiff's medical records, see Doc. 82-2. The medical records reflect that before Corizon began treating Florida inmates, Plaintiff was seen in the Chronic Illness Clinic (CIC) in January 2013, where medical determined he was not eligible for HCV treatment. Id. at 14. On September 13, 2013, the medical provider in the CIC indicated that Plaintiff's HCV markers were "decreasing and fluctuate." Id. at 16.

After Corizon began providing medical care, Plaintiff was seen in the CIC to monitor his HCV on February 27, 2014; August 7, 2014; December 8, 2014; June 18, 2015; and December 8, 2015. Id. at 18, 20, 22, 24, 26. On the December 8, 2014, CIC medical record, the provider wrote that Plaintiff's HCV was

9

"[a]symptomatic." <u>Id.</u> at 22. On June 8, 2015, Plaintiff's HCV was considered "stable," but he complained of an increase in abdominal pain. <u>Id.</u> at 24. Plaintiff also completed bloodwork on February 18, 2014; July 25, 2014; November 25, 2014; December 16, 2014; May 21, 2015; and November 17, 2015. <u>Id.</u> at 62-75.

Additionally, Plaintiff received ultrasounds during Corizon's tenure. On August 22, 2014, Plaintiff had an "ultrasound of the abdomen/right upper quadrant." <u>Id.</u> at 52. The reason for the exam is listed as: "Hep C positive increased AFP and right upper quadrant pain." <u>Id.</u> The ultrasound showed a "[n]ormal-sized fatty liver," "[u]nremarkable gallbladder, a gallbladder polyp was not identified," and "[m]ild splenomegaly." <u>Id.</u> Plaintiff had another ultrasound on June 16, 2015, because he was having "[w]orsening [right upper quadrant] pain," and to "[r]ule out gallstones." <u>Id.</u> at 54. The impression was: "[i]nterval development of mild hepatomegaly, nonspecific, and possibly related to differences in ultrasound technique," "[s]table mild splenomegaly," "[i]ndeterminant 1.4 cm right hepatic lobe mass for which further evaluation with dedicated abdominal/liver contrast enhanced CT study is recommended." <u>Id.</u> Plaintiff underwent a CT scan on July 17, 2015. <u>Id.</u> at 56. The impression was: "1.3 cm x 1.2 cm cyst in the right anterior hepatic segment," "[m]ild diffuse hepatic fatty infiltration," "[s]plenomegaly," "[m]ild aortobiiliac calcific ASVD," and "[d]egenerative change of the spine, most prominently at the lumbrosacral junction." <u>Id.</u>

After Corizon canceled its contract with FDOC, Plaintiff continued to be seen in the CIC. On August 6, 2017, his HCV was considered "stable," and on February 15, 2018, his HCV was considered "stable" and he was being "considered for [treatment]." Id. at 32, 34. On January 30, 2018, Plaintiff had an abdominal ultrasound that showed "[n]o sonographic evidence of acute abnormality. Very mild hepatomegaly." Id. at 59. In April 2018, Plaintiff's HCV was treated with Epclusa, a DAA. Id. at 48-49. On September 25, 2018, Plaintiff's abdominal ultrasound had "[n]o significant findings other than mild splenomegaly." Id. at 60. And on May 21, 2019, his abdominal ultrasound showed "[h]epatomegaly and fatty liver infiltration. Mild dilatation of the inferior vena cava." Id. at 61.

In Plaintiff's Response, as to Corizon's timeliness argument, Plaintiff contends that "[t]he record is devoid of any evidence to support Corizon's insinuation [Plaintiff] lied to the Court." Response at 11. He contends that at the time he wrote the March 8, 2014 grievance, on which Corizon relies, he "did not know what a DAA was." Id. Substantively, Plaintiff asserts that his medical records show he was "twice previously unsuccessfully treated with Interferon, . . . supporting the fact at the time he was one of Florida's sickest Hepatitis-C prisoner patients that should have been treated immediately with DAAs which appeared in the market place in 2013." Id. at 13. He contends that he "was repeatedly told by Corizon medical staff . . . his Hepatitis-C was

11

'controlled,' 'good' or 'stable' and systematically refused providing treatment based on Corizon's policy or custom of providing inmates with false, misleading or inaccurate information just to save money." Id. at 16-17. Attached to Plaintiff's Response is a lab report showing that on November 22, 2017, Plaintiff had "severe fibrosis" (F4). Doc. 95-1 at 2.

In Reply, Corizon asserts that the record shows Plaintiff "actually knew of DAAs when he submitted the grievance in 2014 and was untruthful with the Court at dismissal." Reply at 3. Thus, Corizon asks the Court to find this case untimely filed. Additionally, Corizon contends that Plaintiff has failed to point to any record evidence showing that Corizon had an unconstitutional policy or procedure that harmed Plaintiff or that he was not provided with constitutionally adequate care. Id. Corizon requests entry of summary judgment in its favor. Id.

## V.    Analysis

Upon review of the parties' filings, the Court finds that Corizon's Motion is due to be granted on Plaintiff's Eighth Amendment claim. Thus, the Court need not address Corizon's timeliness argument.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d

1207, 1220 (11th Cir. 2016) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976)). "To establish a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury. <u>Roy v. Ivy</u>, 53 F.4th 1338, 1346-47 (11th Cir. 2022) (citing <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007)). As to the first prong, "a serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotations and citation omitted). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (internal quotations and citation omitted). As to the second prong:

> [The Eleventh Circuit has] synthesized th[e] "deliberate indifference" inquiry into four elements: (1) the official "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) the official "actually drew that inference," (3) the official "disregarded the risk of serious harm," and (4) the official's "conduct amounted to more than gross negligence." [<u>Valderrama v. Rousseau</u>, 780 F.3d 1108, 1116 (11th Cir. 2015)]. The mere fact that medical care is eventually provided is insufficient to defeat a claim for deliberate indifference. <u>Id.</u> An official may still act with deliberate indifference "by delaying the treatment of serious medical needs." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999). But in making the

> determination of whether any particular delay is
> unconstitutional, the applicable court must consider
> "the reason for the delay and the nature of the medical
> need." Id.

Ireland v. Prummell, 53 F.4th 1274, 1287-88 (11th Cir. 2022) (footnote

omitted); see also Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1188-89 & n.10

(11th Cir. 2020) (recognizing "a tension within [Eleventh Circuit] precedent

regarding the minimum standard for culpability under the deliberate-

indifference standard," as some cases have used "more than gross negligence"

while others have used "more than mere negligence"; finding, however, that it

may be "a distinction without a difference" because "no matter how serious the

negligence, conduct that can't fairly be characterized as reckless won't meet

the Supreme Court's standard" (citations omitted)).

 "For medical treatment to rise to the level of a constitutional violation,

the care must be 'so grossly incompetent, inadequate, or excessive as to shock

the conscience or to be intolerable to fundamental fairness.'" Nimmons v.

Aviles, 409 F. App'x 295, 297 (11th Cir. 2011)[2] (quoting Harris v. Thigpen, 941

F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d 1030,

1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute

---

[2] The Court does not rely on unpublished opinions as binding precedent; however,
they may be cited in this Order when the Court finds them persuasive on a particular
point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see
generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not
considered binding precedent, but they may be cited as persuasive authority.").

deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem). Notably, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). As such, a complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted).

Disagreement over the mode of treatment does not constitute deliberate indifference under the Eighth Amendment. See Hamm v. Dekalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

Where a deliberate indifference medical claim is brought against an entity, such as Corizon, based upon its functional equivalence to a government

15

entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); see Denno v. Sch. Bd. Of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d

16

at 1276 (citations omitted); <u>see</u> <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating <u>Monell</u> "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" <u>Grech</u>, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. <u>See</u> <u>Grech</u>, 335 F.3d at 1330; <u>McDowell v.</u>

Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997) (citation omitted); see Sewell, 117 F.3d at 489 (defining "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice."). Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted).

Here, Corizon does not dispute that Plaintiff's HCV constituted a serious medical need. It argues, however, that it provided Plaintiff with constitutionally adequate care and thus did not violate Plaintiff's Eighth Amendment rights.

In their filings, both parties cite to the Hoffer litigation out of the Northern District of Florida. In Hoffer, the Northern District of Florida certified a class consisting of "all current and future prisoners in the custody of the [FDOC] who have been diagnosed, or will be diagnosed, with" HCV. Hoffer v. Jones, 323 F.R.D. 694, 700 (N.D. Fla. 2017). The plaintiffs sued the FDOC Secretary in her official capacity, alleging the denial of DAAs under a

18

cost-savings policy violated, <u>inter alia</u>, the Eighth Amendment.[3] <u>Id.</u> at 696.

Following an evidentiary hearing, on November 17, 2017, the court granted

the plaintiffs' request for a preliminary injunction and issued an opinion. <u>See</u>

<u>Hoffer v. Jones</u>, 290 F. Supp. 3d 1292, 1306 (N.D. Fla. 2017). After resolving

issues raised on summary judgment, on April 18, 2019, the court entered a

permanent injunction mandating that the FDOC provide DAA treatment for

all HCV-positive inmates, including those with only mild or no liver fibrosis,

and finding that "[t]he only reason why FD[O]C is electing not to provide [DAA]

treatment is due to the cost of treatment, which is per se deliberate

indifference." <u>Hoffer v. Inch</u>, 382 F. Supp. 3d 1288, 1302 (N.D. Fla. 2019). The

Secretary appealed the court's summary judgment ruling, and on August 31,

2020, the Eleventh Circuit vacated the district court's permanent injunction;

reversed the court's finding that the Secretary's treatment of HCV-positive

inmates with no (F0) or mild (F1) fibrosis violated the Eighth Amendment,

"with instructions to award summary judgment to the Secretary on that issue";

and remanded the rest of the district court's order, "so that it can make the

findings required by the [Prison Litigation Reform Act]." <u>Hoffer v. Sec'y, Fla.</u>

<u>Dep't of Corr.</u>, 973 F.3d 1263, 1279 (11th Cir. 2020). The Eleventh Circuit

reasoned that the Eighth Amendment does not prohibit prison officials from

---

[3] Corizon was not a party to the <u>Hoffer</u> litigation.

considering cost in determining what type of medical treatment to provide, and since the Secretary had implemented a treatment plan that provides "minimally adequate care," the plaintiffs cannot say that her conduct in treating HCV-positive inmates amounted to deliberate indifference. <u>Id.</u> at 1277-78.

Here, the record reflects that Corizon did not violate Plaintiff's constitutional rights by considering the cost of DAA treatment. Corizon prioritized inmates with HCV and routinely monitored Plaintiff's condition. Plaintiff's medical records confirm that Corizon maintained its duty to provide constitutionally minimally adequate care to Plaintiff. Plaintiff's HCV was consistently monitored in the CIC. There is no evidence to suggest that Plaintiff's condition necessitated immediate treatment with DAAs during Corizon's tenure. Indeed, his HCV was considered stable and when he complained of increased abdominal pain, Corizon ordered an ultrasound and a CT scan (in addition to his other routine tests and monitoring). Similarly, the evidence, specifically Plaintiff's ultrasound reports after he received DAA treatment, does not support a finding that any delay in treatment resulting from Corizon's actions caused Plaintiff injury. The bloodwork Plaintiff attached to his Response was completed more than 18 months after Corizon ceased providing medical care to Florida inmates and before he received DAA

treatment. Thus, that bloodwork does not prove Corizon's care was constitutionally inadequate.

Even viewing the facts in the light most favorable to Plaintiff, Corizon has shown, by reference to Plaintiff's medical records and Dr. Ladele's Declaration, that there is no genuine issue of material fact. Plaintiff's arguments to the contrary and the evidence he submitted are insufficient to show a genuine dispute. The record simply fails to support Plaintiff's claim that Corizon acted with deliberate indifference to his HCV, and summary judgment is due to be granted in Corizon's favor.

Accordingly, it is

**ORDERED**:

1.     Defendant Corizon Health, Inc.'s Motion for Summary Judgment (Doc. 83) is **GRANTED**.

2.     The **Clerk** shall enter judgment in favor of Corizon and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of February, 2023.

_____
BRIAN J. DAVIS
United States District Judge

21

JAX-3 2/1
c:
James Herndon, #187913
Counsel of Record